UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MDL NO. 1430
MASTER FILE NO. 01-CV-10861-RGS

IN RE: LUPRON® MARKETING AND
SALES PRACTICES LITIGATION

<u>MEMORANDUM AND ORDER ON
CY PRES DISTRIBUTION OF THE REMAINDER
OF THE LUPRON® SETTLEMENT FUND</u>

August 6, 2010

STEARNS, D.J.

As explained in previous orders, the court's consideration of the cy pres distribution of unclaimed funds[1] in the Settlement Pool has narrowed to two proposals, both of which have as their focus research into cures for prostate cancer, precocious puberty, and other diseases treated by Lupron®,[2] a drug marketed and sold by TAP Pharmaceutical Products, Inc. (TAP).[3]  For legal guidance, the court has turned to three Circuit Court decisions: <u>In</u>

---

[1] As of August 3, 2010, a total of $11,423,624.59 is on deposit in an interest-bearing account maintained by the Clerk of the District Court.

[2] The drug leuprolide acetate, marketed as Lupron®, is used primarily to treat patients with prostate cancer, although it is also an effective treatment for other conditions like precocious puberty.  Other than skin cancer, prostate cancer is the most common cancer affecting American men. The American Cancer Society estimated that in 2009 some 192, 280 new cases of prostate cancer were diagnosed and 27,360 men died of the disease. http://www.cancer.org/Cancer/ProstateCancer/DetailedGuide/prostate-cancer-key-statistics (June 30, 2010).

[3] In the original national Class Action Complaint, which was assigned to this court by the Multi-District Litigation Panel, a consortium of patients and health care plans alleged that defendants Abbott Laboratories, Takeda Chemical Industries, Ltd., and TAP (an Illinois corporation owned by Abbott and Takeda) conspired to artificially inflate the price for Lupron® in a fraudulent scheme targeting Medicare patients.  Grounded on the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18

re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 32-35 (1st Cir. 2009); Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007); and Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1306 (9th Cir. 1990).  The court has carefully reviewed the submissions of the authors of the two competing proposals (which I will label for convenience as Proposal A and Proposal B), and the suggestions and comments of class members, counsel involved in the case, and the public.[4,5]

---

U.S.C. § 1962 et seq., the Complaint sought recovery of the alleged overcharges for Lupron®, as well as a punitive trebling of damages.

[4]The court posted the two submissions on its website on May 25, 2010.  The court also posted the questions it addressed to the authors of the two proposals, together with their answers and comments. (The public comment period expired on June 25, 2010). Among the comments received was that of Intervenor Valerie Samsell. See Dkt #565.  She requested that the remaining settlement funds be distributed one half to Dana-Farber and "other foundations supporting research in the treatment of infertility, endometriosis, ovarian and breast cancer, and precocious puberty in memory of Dennis Rohn," and "the other half should be distributed among plaintiffs in the Lupron® Depot [sic] Class Action Suit.  This way, both parties will be awarded and everyone may then go forward with their lives." Id. at 2.  The notice program mandated by the court and conducted by Hilsoft Notifications, a Pennsylvania company that specializes in class action notice campaigns, generated nearly 11,000 responses from class members.  Class members were paid 167 percent of all of their claimed out-of-pocket Lupron® expenditures.  As was established at the initial cy pres hearing, a supplemental consumer claims process could be exorbitantly expensive (estimated at upwards of $1.74 million), time-consuming, and would likely recruit few new claimants given the high mortality rate among members of the class (persons prescribed Lupron® between January 1, 1991 and September 30, 2001).  See May 19, 2009 Order at 2.  There was no consensus among the various plaintiffs' counsel as to how the surplus funds should be distributed.

[5]The court adds a brief reply to Dr. Kevin Loughlin's criticism that the court's deliberative process reflects a "total disregard for deadlines and for the confidentiality of competing proposals." Dkt #554 at 3. The complaint is apparently based on Dr. Loughlin's experience with the practices of the National Institutes of Health and other granting agencies.  The court's role, however, is not that of a granting agency.  The court is charged with the equitable distribution of the unclaimed funds in the Class Settlement Pool.  Under the strictures of the cy pres doctrine, the court is obligated to distribute the funds in a way that most closely approximates the goals of the underlying class litigation

Proposal A was authored by Dr. Kevin Loughlin, the Director of Urologic Research at Brigham and Women's Hospital.[6] Dkt #519-3, 541-1, 548-1. Proposal A was submitted on behalf of a committee of four Harvard Medical School professor-physicians (collectively, the Loughlin Group) who were asked by class counsel to formulate a recommendation for the distribution of a portion of the cy pres surplus. The Loughlin Group includes each of the medical disciplines involved in the diagnosis and treatment of prostate cancer (urologic surgery, medical oncology, radiation oncology, and primary care medicine). See Dkt #541, 554, 561. Proposal B was submitted by the Dana-Farber/Harvard Cancer Center (DF/HCC) and the Prostate Cancer Foundation (PCF).[7] See Dkt #562. Its principal author was Dr. Philip W. Kantoff, the Chief Clinical Research Officer at the Dana-Farber Cancer

---

(as best as they can be discerned by the court). In discharging its stewardship, the court is required by legal and constitutional constraints (and its own preference) to proceed in the most transparent way possible. The court also notes that the deadlines for consideration of submissions shifted not because of any capriciousness on the court's part, but because of an intervening appeal of the court's cy pres intentions by the attorney for the Intervenors to the First Circuit Court of Appeals, which divested the court of jurisdiction from June 17, 2009 to January 7, 2010.

[6]The three other physicians who propose, with Dr. Loughlin, to form a committee to oversee distribution of the cy pres funds are Dr. Marc Garnick, an oncologist and prostate cancer researcher at Beth Israel-Deaconess Medical Center, Dr. Anthony Zietman, a radiation oncologist at Massachusetts General Hospital, and Dr. Michael Barry, the Chief of the General Medicine Unit at Massachusetts General Hospital. See Dkt #541-1, Ex. A.

[7]DF/HCC is a National Cancer Institute-designated research center, consisting of over 1,100 Harvard Medical School faculty members. Established in 2001, DF/HCC's Prostate SPORE (Specialized Programs of Research Excellence) funds research and shares data with scientists both within and outside DF/HCC. The PCF, founded in 1993, has funded some 1,500 programs at 200 research centers worldwide targeted at new prostate cancer treatments, including gene therapy and potential vaccines. See Dkt #562, App. B (DF/HCC SPORE in Prostate Cancer Award History and Developmental Projects Program).

3

Institute (DFCI). The public comment period expired on Friday, June 25, 2010.

The Loughlin Group proposes to use the cy pres funds "to maximize the care of prostate cancer patients through education, diagnosis, research and treatment." Dkt #519-3 at 1. The Loughlin Group anticipates awarding grants of nearly $5.89 million over a five-year period "on any topic related to prostate cancer" that involves: (1) clinical and basic research; (2) community and patient outreach; (3) the recruitment of health care professionals into prostate cancer treatment; and (4) continuing education. Over the same period of time, the Loughlin Group intends to make an additional forty awards on a competitive basis totaling $3 million to residents, fellows, and junior faculty members who have an interest in prostate cancer research. The Loughlin Group would also make awards to forty current medical students totaling $1 million, and twenty awards to nurses totaling $200,000 to promote patient care and nurses' education. The Loughlin Group proposes to solicit grant applications through an informational campaign using free and paid media targeted at the medical community. Finally, the Loughlin Group proposes to convene research symposia at the end of years three and five to showcase grantees' research results. In sum, the Loughlin Group expects to distribute roughly $10 million in grants, with an additional $1.7 million spent for overhead costs (including roughly $1 million in salaries to be paid to the four members of the governance committee).[8]

---

[8] In its original proposal filed August 29, 2008, the Loughlin Group proposed a four-year program with a total budget of approximately $4.5 million (consisting of roughly $4 million in grants, $150,000 in overhead expenses, and $500,000 in salaries paid to the members of the governance committee). In response to the court's stated inclination to dedicate the entire fund to Lupron®-treated disease research programs, the Loughlin Group expanded the proposal to span five years with a budget of $11.4 million.

Under Proposal B, DF/HCC and the PCF will partner to distribute incentive awards to promote research into prostate cancer and other Lupron®-treatable diseases. See Dkt #562. PCF is primarily an award-granting institution, while DF/HCC is principally a research organization, although it has grant-making capability. In granting awards, PCF utilizes a venture capital model of investing in high-impact, high-risk research projects with the expectation of leveraging promising results into grants from more traditional funding sources. DF/HCC promotes collaborative interactions and encourages translational research to generate new approaches to cancer diagnosis and care.

The ultimate goal of the Proposal B partnership is "to reduce prostate cancer incidence and mortality," and "to improve [the] quality of life of those with prostate cancer." Id. at 13. Ninety percent of the cy pres funds would be dedicated to research, while ten percent ($1.1 million) would be used to support the costs of grant administration.[9] DF/HCC proposes to oversee the design and implementation of seven DF/HCC award categories that are intended to catalyze collaborative research at a national level.[10] PCF will independently oversee the design and implementation of a special category of awards to

---

[9] DF/HCC and PCF propose to use their existing administrative structures rather than create a new structure for the award of the cy pres funds.

[10] The awards (given over a two-year period) would be as follows: five High Impact Awards - $500,000; nine Project Development Awards - $100,000; six Career Development Awards - $100,000; three Lupron®-treatable Disease Awards - $100,000; eight Student Training Awards - $20,000; five Disparity Research Awards - $100,000; and four Community Outreach Awards - $100,000. See Dkt #562 (containing a detailed description of each proposed grant category).

be given to teams of researchers on a national and international level.[11]  Potential award recipients will be recruited within Massachusetts by DF/HCC.  National and international applicants will be recruited by members of the Oversight Board through their respective institutions and by PCF through its media contacts.  Grant applications will be vetted by existing review committees.  The Oversight Board, composed of national leaders in prostate cancer research, will oversee granting activities and the distribution of the cy pres funds.[12]

After careful deliberation, the court has decided to award the cy pres funds to the DF/HCC and PCF partnership, pursuant to the terms of the proposal submitted on May 20, 2010, with modifications as noted.  The court's decision is influenced principally by the following considerations.  DF/HCC and PCF are established non-profit organizations, each

---

[11] The five PCF Challenge Grants will also have a two-year duration, each with $1 million in funding.

[12] DF/HCC and PCF will convene a scientific advisory board (Oversight Board) "to ensure that Settlement Funds are distributed fairly, and in accordance with Request for Proposal guidelines and any other principles that are associated with such funds."  Dkt #562 at 5-6.  The Board will be composed of the following individuals: Dr. Howard Soule, PhD - Executive Vice President and Chief Science Officer at PCF; Dr. Philip Kantoff - Director of the Lank Center for Genitourinary Oncology at DFCI and Director of the Prostate Program and SPORE at DF/HCC; Dr. William Nelson, PhD - Director of the Johns Hopkins University Cancer Center and Director of the Prostate SPORE at Johns Hopkins University; Dr. Peter Nelson - Director of the Prostate SPORE at the University of Washington; Dr. Peter Scardino - Chairman of Surgery and Chief of Urology at Memorial Sloan Kettering Cancer Center and Director of the Prostate SPORE at Memorial Sloan Kettering Cancer Center; Dr. Jonathan Simons - President and Chief Executive Officer at PCF; Dr. Ken Pienta - Director of the Prostate SPORE at the University of Michigan; Dr. Donald Tindall, PhD - Director of the Prostate SPORE at The Mayo Clinic; Dr. Peter Carroll - Chief of Urology at the University of California at San Francisco and Director of the Prostate SPORE at the University of California at San Francisco; and a court-appointed member.  See Dkt #562, App. F.

with experience in managing grant programs. Proposal B leverages existing institutional infrastructure, funding mechanisms, and the relationships established by DF/HCC and PCF, with a corresponding reduction of start-up and administrative costs. Proposal B also promises a broad national outreach to attract large-scale research collaborations, innovative pilot projects, promising young investigators, and talented graduate students. Proposal B further recognizes that not all members of the class are prostate cancer victims and proposes to dedicate an appropriate portion of the funds to research involving cures for other Lupron®-treated diseases and conditions, such as precocious puberty.

The court looks favorably on the fact that the grant proposals will be vetted and supervised by committees whose members will be drawn from a nationwide pool of medical talent.[13] I am also impressed by the fact that these members, including those on the proposed Oversight Board, have agreed to serve pro bono. Finally, Proposal B speaks directly to the court's desire that a significant percentage of the funds be spent on research of a high-risk nature that might not otherwise attract funding from traditional sources.[14]

## ORDER

For the foregoing reasons, the court awards the unclaimed funds from the Lupron®

---

[13]The members of the DF/HCC and PCF review committees represent the areas of surgical urologic oncology; medical oncology and treatment sciences; immunotherapy; radiation oncology; genomics; gynecology and reproductive medicine; nutrition research; molecular imaging; and molecular pathology. Collectively, they are based at forty-five institutions throughout the United States.

[14]None of these considerations is intended as a criticism of Proposal A. The court had the luxury of choosing between two well thought out alternatives. It simply believes that Proposal B best matches the aspirations of the underlying class action.

Class Settlement Pool to DF/HCC and PCF to be distributed according to the terms of the proposal submitted to the court on May 20, 2010, attached as Appendix A. The court also orders as follows.

(1) The funds are to be maintained and paid out of a single account to be known as the Settlement Pool Account. The court appoints Dr. Philip W. Kantoff as the individual responsible for the day-to-day management of the award program and all fund expenditures.

(2) DF/HCC and PCF are to submit an annual report on the anniversary of this Order detailing all Settlement Pool Account activity. The report is to include a summary of program awards, grantees' progress, and a summary of all expenditures, including administrative costs.

(3) DF/HCC and PCF will provide the court with interim six-month reports setting out a brief description of Settlement Pool Account activity and award-related activity.

(4) The funds will be paid by the Clerk in one-third installments as individually authorized by the court, the second and third installments subject to the court's review of the annual and semi-annual accountings.

(5) The court hereby appoints Dr. Jonathan L. Tilly as its representative on the Oversight Board. Dr. Tilly will serve as a full member of the Oversight Board in all respects, and will report to the court as directed.[15]

---

[15] Dr. Tilly is the Chief of the Division of Research at the Vincent Center for Reproductive Biology at Massachusetts General Hospital and Professor of Obstetrics, Gynecology, and Reproductive Biology at Harvard Medical School. Dr. Tilly has served as a special law clerk to the court. The undersigned judge is also the Chair of the Trustee Committee at Vincent Memorial Hospital (MGH) that oversees the work of the Vincent

(6)  The court reserves the right to nominate a patient advocate to the DF/HCC Prostate Cancer Program and SPORE Governance Committee.  <u>See</u> Dkt #562.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

Center.  Dr. Tilly has volunteered his services pro bono.